Two cases have been consolidated for purposes of argument. They are 20-1012 In Re The Board of Trustees and 20-1288 In Re The Board of Trustees. Mr. Kaus, am I pronouncing your name correctly? That's correct, Your Honor. All right, please proceed. Thank you, and may it please the Court. This is a consolidation of two cases where, in each case, the Board affirmed the examiner's rejection under Section 101 that the claims were directed to an abstract idea. In both cases, the claims at issue describe a very specific method of inferring or predicting haplotype phase, data that is not readily available in typical whole-genome sequencing but that is very important in understanding genetic risk. These patents are in the field of bioinformatics, where computer and information processing techniques can be combined with biological and genetic information to detect and diagnose certain conditions. Such efforts go to a future of personalized medicine, where genetic and biological information will be used to tailor medicine to a specific patient. In the first application at issue from case number 1012, Claim 1 requires collection of a specific set of data and calculation of an intermediate value, the inheritance state, using specific hidden Markov model with six specified hidden states. The newly generated... Judge Lori. Go ahead, Chief. Oh, no, I was just going to say that the problem for me, so maybe you can get to the heart of it, is that these cases have a very strong feel just like some of our others, which include electric power mainly and a few others. This seems like it's pure data analysis. It uses the same terms of receiving, inputting, and that's just a snap of the kind of claims that we have previously said don't pass muster. Collecting data, analyzing data, displaying data. This is electric power or SAP. So tell me why this is different from those cases. I think the main distinction between this and electric power, SAP, Digitech, content extraction, is that in all of those cases they were taking existing data and organizing it and displaying it. The key factor here is this is not existing data. This is data that had to be created with additional steps the inventors came up with to... They collect a certain amount of data, the genotype data, and then that data, because of the way it's collected through high throughput output sequencing, there are errors inherent in that data, and the inventors came up with a way to correct that error and generate better data. So that's that first step in the first patent, and then they take that... Counsel, but at the end of the day, don't you still have a situation where you have data, you collect other data, you merge or analyze the two sets of data together, and then you publish the result, which is data? You don't get out of the realm, this abstract realm of data manipulation. Your Honor, I think the difference there is we're not just manipulating data, we're creating data. I think it lines up very well with the claim in the Fingen case where the claims required that a downloadable be received by an inspector, that a profile be generated related to that downloadable, so that's just collecting data and analyzing the data, and then that data be shared, or first they'd be linked and then that data be shared. So that didn't really even have the length of steps we do, and I think Judge Frost mentioned electric power. That case was very, very broad. They were basically claiming the result. There were no specifics, and here, much more like McRow, we have a set of rules, and in fact, not just a genus of rules like McRow had, but very specific rules narrowing down the particular mathematical model, the hidden Markov model that must be used, and not only that, but specifying that it must have the six particular states, and then on top of that, it has to be using two additional particular sets of data. Counsel, this is Judge Laura. You say you're creating data, but you're creating data from other data, and aren't these mental steps? So I think given the complexity of the genetic data, there are too many data points for this to be done in a person's mind or even manually on paper. We get into the millions and even billions of data points, but we're not just manipulating existing data. The inheritance state data is created in the first patent, and then in the second step, haplotype phased data is created that didn't exist previously. And when you get to the second case, the 1288 case, the claims in that patent are even more detailed in the steps that must be gone through, and so when you look at the particular selection of the data, this was solving a problem with errors in the underlying data, and it comes up with a mathematical model that they use and an iterative process, and it tracks very well with the computer processing claims that were used in McRow and in FinGen and KPN, and the McRow court noted that the output was not necessarily tangible and that the concern there was really going to preemption, and here we've created this new data. Instead of animation data, it's genetic data that may be used to treat disease. Didn't McRow improve the operations of the computer? It did through the software, which is exactly what we're doing here. We are improving the field of determining haplotype phase by correcting errors in the underlying data and creating new, more accurate data, just like McRow created more accurate animation data. Well, I'm just following up. This is Judge Prowse. Just following up on Judge Lurie's question, can you explain what technology you're arguing that the claims improve? You cite EnFISH in your briefs repeatedly. That was a technological improvement case. Point me to the technological improvement. So in EnFISH, the technological improvement was an improved computer database structure, and in here, in the second case especially, in the 1288 case, there is particularly claimed the data structure, and it's an improved data structure featuring this hidden Markov model and the use of particular data, the parameters that are used, and that is the field that's being improved. The technological field is genetics and the ability to accurately determine or predict haplotype. Counselor, what do you mean by improved data structure? If I have an algorithm and I say 2 plus 2 equals 4, have I created a new data structure? I don't believe... Is 4 newly created data? We don't believe that is. However, if you look back to the EnFISH case, the improvement in the database data structure was that it was self-referential, and we have a very similar situation here in the 1288 patent. Well, EnFISH is about improvement of a technology, and this is my point. You're talking about improvement of data structures. I see a difference between the two. What do you say to that? Our interpretation of EnFISH is that the technology that was being improved was the database structure. That's what the claim is directed to, and they found that this self-referential database was different than existing databases, so it allowed the computer to operate more efficiently. Similarly here, the particular data structure that's claimed in the 1288 patent has that same self-referential, what we call machine learning, in that it imputes a value, uses other data to try and determine if that value is accurate or not, and keeps refining the value in this iterative process, including using the new data it created to help fight against the errors in the underlying data. So that's an improvement in the data structure that, like the improved data structure in EnFISH, improved the operation of the computer, particularly in processing databases. This improves the operation of the computer in processing that underlying genetic data to arrive at the haplotype phase. So moving on, the main errors that the board committed in this case were, we believe, started with what the claim was directed to. The cases state that, you know, one must look at the entire claim. We cite heavily to the CellsDirect case, in which the district court found that the claims were directed to the underlying natural law that hepatocytes can survive multiple freeze cycles. But this court reversed that, finding that the claims were instead directed to an application for processing hepatocytes. Here we think the board looked and used the patent office guidelines as sort of a checklist. They have a list where they go through it. I believe it's prong one. And they look and see, are there any abstract ideas within the claim? And this court, on numerous occasions, I believe we cite to the EnFISH case, has said that when performing the directed-to inquiry, one cannot simply look at whether the claim involves a law of nature. Here, the patent office looked and said, well, the claim has a hidden Markov model. That's a mathematical concept. Therefore, it involves mathematics. But they never went further to determine, is the claim actually directed to that? In the Diamond v. Deer case, the Supreme Court set out a very good tool for determining that directed-to inquiry. The court there noted that the patentee did not seek to use or seek to preempt the use of the Arrhenius equation, but instead sought only to foreclose from others the use of that equation in conjunction with all of the other steps in their process. And so here, we believe the board actually concedes, and the director, that our claims would not preempt use of a hidden Markov model. They would not preempt the ability to approximate or predict haplotype phase. And they wouldn't even preempt the combination of using a hidden Markov model to predict haplotype phase. They only preempt the particular, very, very detailed steps specified in the claim. So I think when you look at what the Deer court said, our claims are not directed to a mathematical model. They do not preempt the use of a mathematical model. They only preempt following all of the individual steps in the claim. The next error we believe the board... Looking at those individual steps that you're talking about, and claim one being representative, I guess this is in the 1012 case, the additional limitations are receiving, storing, and providing. Are those the additional steps or limitations you're saying are preempted? Those, at that level, they are not preempted, because at that level, every computer process would be preempted, as all computer processes include receiving, storing, and extracting. That would mean that McRow, FinGen, KPM, and all of those would be patent-ineligible, because they are receiving data, analyzing and processing it, creating new data, and outputting that data, just like we have here. Aren't those the only additional limitations that are in representative claim one? Those limitations include the source of the data and how it's being used and manipulated. So I think here, the source of the data in claim one was key in being able to address the errors in the underlying genotype data. When you look at the other cases that we cite to, they were similarly receiving data. So if you just, you know, in FinGen, it was receiving a downloadable. Well, if you take out the receiving, the processing, and the extracting steps from FinGen, there's nothing left in the claim. Here, we think you cannot generalize those steps into that high level of sort of computer input-output steps. You have to include the actual limitations of the claim that include key features of the invention. Namely, the inventors here came up with what data they needed to collect to solve the issue and then addressed it. And in the 1288 case, I think, you know, there's definitely receiving, storing, processing, and extracting steps, but there's also this machine learning aspect, and when you get to claim 32, even more detail on the particular parameters of the hidden Markov model and using a training set of data. So those are additional steps. The only evidence on the record is those are unconventional steps, and the director's argument is that they're conventional when you generalize them down to receiving, storing, and extracting, but there's no argument that the actual detailed steps of collecting the particular data and using it in this machine learning recursive process is conventional. And I heard the buzzer. I will, unless there are further questions, preserve my remaining time. Thank you. Thank you. Ms. Queeler, how do you pronounce your name? Queeler, Your Honor. Queeler. Okay. Please proceed. Thank you. Your Honors, and may it please the Court. In this case, the Board properly engaged in a straightforward application of the ALICE two-step framework and correctly found that the claimed haplotype phasing methods in both applications are patent ineligible. At step one, the Board correctly found that the claims of both applications as a whole are directed to the abstract idea of mathematical operations to predict haplotype phase. For example, both sets of claims center around a hidden Markov model, which is undisputably a mathematical model, and also involves statistical phasing of a haplotype. Phasing is also a statistical concept, also falling within the category of mathematical operations. So appellant here is emphasizing the need or the claims requirement for very specific, narrow inputs into these equations, such as the pedigree data that they recite in Claim 1 of Appeal 1012. But all of these very specific, narrow limitations that they've emphasized in their briefing and to the Court today just narrow the math down. They don't change the fact that... Counselor, let's judge right. What's your response to your opponent's argument that these claims contain specific rules that are applied in a specific manner to achieve a specific result? Yes, Your Honor. So first, I think they're arguing with respect to their specific rules and they create a specific result boils down to their argument that creating new data supplies the eligibility. And there's just simply no support for the idea that just creating data alone is enough. I mean, that is what math does. It creates new data. And here, unlike the claim... or unlike the cases that they've cited, such as Enfish and Fingen, they don't use that data to improve anything outside of the abstract idea itself. So any improvement is within increased accuracy of the math. So increased improvement... or excuse me, the improvement is within the abstract idea. In contrast, the claims or the cases that they cite, such as McRow, this court has said, was an improved computer display. So the computer itself was improved. In Fingen, it was a new security file that improved computer functionality. So the improvement was to something outside of the abstract idea. And here, instead of improving the computer, they're just using the computer as a tool to improve the math itself. So I think there's two points there. One, just creating data alone is not enough to impart patent eligibility, because as I said, that is what math does. And then second, there is no improvement that would take the ideas in both of these claims outside of the abstract realm of just mathematical operations. So as a whole, the board correctly concluded that the claims as a whole are directed to the abstract idea of mathematical operations. And then moving on to step two, the board correctly found no inventive concept that any additional elements in the claims outside of the abstract idea did not transform the claims into patent eligible. As your honors mentioned, they just... the additional elements are directed to receiving, storing, and displaying of information. And these additional limitations, viewed both separately and together, are just conventional generic computer functions and just don't take the claims outside the realm of the abstract idea. One final point, unless your honors have any questions with respect to their preemption argument. While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate eligibility. And granting exclusive rights over claim one in both of these appeals would preempt the use of these mathematical algorithms for haplotype phasing, regardless of whether other data sets or methods could be used. So they still are tying up these building blocks of statistical analysis. And that's why, in principle, we don't allow patenting just basic mathematical algorithms. And there's no eligibility exception because the narrowness is of the abstract idea. The Supreme Court in Mayo noted that narrow math is still abstract. There's no line of how narrow math can be that catapults it into ineligible application. And Mayo noted the Fluke case, where there was very new math, it was very narrow math, that calculated an alarm limit, and that itself was ineligible because the entire claim was directed just to the mathematical concept. And appellants here, despite our briefing focusing on the Fluke case and the Board mentioning the Fluke case, have failed to really distinguish that case, which I think is notable. So unless Your Honors have any questions, I'm happy to cede the rest of my time, just pointing out that we'd ask the Court to affirm the Board's determination that the claims in both appeals are directed to patent-ineligible subject matter under 101. Hearing no questions, thank you. Thank you. Mr. Couse, rebuttal time? Yes, Your Honor. I'd like to address a few of the issues. First, my friend on the other side noted that preemption is not dispositive of patent eligibility. But we'd like to point out, the Deer Court, as I mentioned earlier, said that preemption was indicative of what the claim was directed to. And so I think that colors the entire analysis. If you initially incorrectly... But you can have narrow... I'm sorry, this is Judge Crouch. You can have a very narrow preemption, right? Correct. You don't have to preempt the world in order for it to be a problem. It can be in a very narrow space or lane, right? We agree with that, and we would point back the distinction that they made in Deer was that they were not preempting use of this Arrhenius equation, a known mathematical model. They were only preempting following all of the method steps here. And so in that case, the court determined the claim was not directed to that mathematical model, unlike in Fluke, where the court determined that it was basically automating existing processes and was trying to claim the mathematical equation in that case. Here, there is preemption, but it's very, very narrow. We disagree that it would actually preempt use of a hidden Markov model in determining haplotype phase. It would only preempt the use, in the first case, of a hidden Markov model with these particular six hidden states combined with these two additional data sources and would not preempt use of the hidden Markov model in general to determine haplotype phase. And in the second case, there's even more detail, so the preemption is even narrower. The second point we'd like to make is that the ALICE test needs to apply equally to all cases. And there's been talk of, you know, whether our case is closer to Mayo, we think it's closer to EnFish, but we feel the board discounted all the computer cases that we cited, McRow, FinGen, KPN, EnFish, because they were computer cases and not bioinformatic or natural science cases. But the ALICE test applies equally to all. When you look at McRow, the result of McRow was improved animation data. In FinGen, the result was improved security data, a file, a computer file. In KPN, it was improved check data. And the KPN court noted that it was not necessary to even claim an application of that data, that it was known in the art that improved check data was useful. And here, it's very well known in the genetic field that improved haplotype data will be extremely useful as we move towards personalized medicine. In the Bascom case, the court initially found that the method there was abstract, but under ALICE Step 2, said the additional steps were enough to change it. And those were traditional computer steps. This was a filtering data over the internet case. So here, we think when you look to the actual cases we cite, they are all about processing data. And the key differentiator between the cases we cite and the Digitech SAP content extraction cases are that those were just manipulating existing data and not improving anything. They're sort of statistical analysis of where financial data would lie, or it's an illustration of that data. Whereas here, we're actually correcting and creating new data. I believe Judge Reyna gave me an example earlier about 2 plus 2 equals 4. Here, what our method would be doing is actually analyzing whether those twos in the 2 plus 2 are correct. And it would correct that data, and your result would no longer be 4. You would actually get the accurate data from the underlying data because we've sort of created this intermediate step. And I think even more exciting is in the 1288 case, we would guess at a value and use our parameters to refine that value. But it's an iterative process, and it can not only produce better data for the person you're trying to determine the haplotype phase for, but because of this machine learning recursive process, it will go back and refine the data for other people. So we believe these additional, even if the court finds that this is abstracted step one, these additional steps have to be considered in their entirety, not just receiving, but what data are you receiving? It's the selection that the inventors came up with of what data will fix the problem, and then processing that data to come up with a new, more accurate haplotype phase. So we believe that because improved data has been found patentable in the field of computer animation, in the field of computer security, it should also be found patent eligible in the field of bioinformatics. Alice must apply equally across. We request that the court reverse both the rulings in this case. Thank you. We thank both sides, and both cases are submitted.